# STATE OF MICHIGAN

# COURT OF APPEALS

In re HINES/NEAL, Minors.

UNPUBLISHED
August 16, 2016

No. 326780
Macomb Circuit Court
Family Division
LC Nos. 2014-000137-NA;
2014-000138-NA;
2014-000139-NA

AFTER REMAND

Before: JANSEN, P.J., and CAVANAGH and GLEICHER, JJ.

PER CURIAM.

This case returns to us after remand to the trial court in order for the court to make findings of fact and conclusions of law regarding the statutory grounds for termination of respondent-appellant's parental rights to the minor children, BEH, RJN, and ODN. See *In re Hines/Neal*, unpublished order of the Court of Appeals, entered December 15, 2015 (Docket No. 326780). We concluded that the trial court failed to make independent findings on the statutory grounds for termination. *Id*. We directed the trial court to determine on remand "whether, on the basis of clear and convincing legally admissible evidence, the facts alleged in the petition are true and establish a statutory basis for termination." *Id*. The trial court conducted an updated hearing and again terminated respondent's parental rights under MCL 712A.19b(3)(b) (child suffered abuse and there is a reasonable likelihood that child will be abused in the future),[1] (c)(*i*) (conditions of adjudication continue to exist), (g) (failure to provide proper care or custody), (j) (reasonable likelihood that child will be harmed if returned to parent), and (k)(*iii*) (parent abused child or a sibling and abuse included battery, torture, or other severe physical abuse). We affirm.

---

[1] We note that the trial court did not specify whether termination occurred under MCL 712A.19b(3)(b)(*i*), (*ii*), or (*iii*). However, petitioner sought termination under MCL 712A.19b(3)(b)(*i*).

-1-

I. EVIDENTIARY CHALLENGES

This case arises from an initial petition to terminate respondent's parental rights following the discovery of injuries to RJN during a wellness check.[2]  Respondent contends that the trial court abused its discretion in admitting inadmissible evidence and relying on the opinions of witnesses who did not testify as experts during the termination hearing.  We disagree.

The trial court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion, which occurs when the trial court chooses an outcome falling outside the range of principled outcomes.  *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 629; 853 NW2d 459 (2014).  However, any preliminary questions of law are reviewed de novo.  *Id*. at 629-630.  "This Court reviews for an abuse of discretion a trial court's qualification of an expert witness and its ultimate ruling regarding whether to admit expert testimony."  *People v Wood*, 307 Mich App 485, 507; 862 NW2d 7 (2014), vacated in part on other grounds 498 Mich 914 (2015).

As noted in our previous opinion, in general, the rules of evidence apply to the adjudicative phase of a child protective proceeding, but not during the dispositional phase of the child protective proceeding.  MCR 3.972(C)(1); MCR 3.973(E)(1).  However, the application of the rules of evidence differs when termination is requested at the initial dispositional hearing.  MCR 3.977(E).  MCR 3.977(E) provides:

> The court shall order termination of the parental rights of a respondent at the initial dispositional hearing held pursuant to MCR 3.973, and shall order that additional efforts for reunification of the child with the respondent shall not be made, if
>
> > (1) the original, or amended, petition contains a request for termination;
> >
> > (2) at the trial or plea proceedings, the trier of fact finds by a preponderance of the evidence that one or more of the grounds for assumption of jurisdiction over the child under MCL 712A.2(b) have been established;
> >
> > (3) *at the initial disposition hearing, the court finds on the basis of clear and convincing legally admissible evidence* that had been introduced at the trial or plea proceedings, or that is introduced at the dispositional hearing, that one or more facts alleged in the petition:
> >
> > > (a) are true, and
> > >
> > > (b) establish grounds for termination of parental rights under MCL 712A.19b(3)(a), (b), (d), (e), (f), (g), (h), (i), (j), (k), (l), (m), or (n);

---

[2] For a summary of the relevant facts in this case, see *In re Hines/Neal*, unpublished opinion per curiam of the Court of Appeals, issued December 15, 2015 (Docket No. 326780).

(4) termination of parental rights is in the child's best interests. [Emphasis added.]

Thus, the statutory grounds for termination must be established by clear and convincing, legally admissible evidence in this case because termination occurred at the initial disposition hearing. See MCR 3.977(E).

Respondent contends that the trial court improperly considered hearsay testimony when rendering its decision. Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). A statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). Hearsay is inadmissible except as provided by the rules of evidence. MRE 802. "If . . . the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013). A statement offered to show why an individual took certain action is not hearsay. See *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007). Records kept in the ordinary course of business are admissible as an exception to hearsay. MRE 803(6). A laboratory report prepared by a nontestifying analyst is hearsay. *People v Payne*, 285 Mich App 181, 196; 774 NW2d 714 (2009). However, a record related to treatment is generally admissible if it is a record of regularly conducted activity. See MRE 803(6).

Respondent further contends that the trial court impermissibly considered the testimony of certain physician witnesses because the witnesses were required to be qualified as experts in order for the court to consider their testimony. The rules of evidence govern admission of lay witness and expert testimony. Limited opinion testimony from a lay witness is permitted by MRE 701, which provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"Any witness is qualified to testify as to his or her physical observations and opinions formed as a result of them." *Lamson v Martin (After Remand)*, 216 Mich App 452, 459; 549 NW2d 878 (1996). A lay witness may testify regarding opinions and inferences that are rationally based on the perception of the witness and are helpful to understand the witness's testimony or the determination of a fact in issue. *People v McLaughlin*, 258 Mich App 635, 657; 672 NW2d 860 (2003).

MRE 702, which governs the admissibility of expert testimony, provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Surman v Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007), this Court delineated the following requirements for expert testimony:

> The admission of expert testimony requires that (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man. The party presenting the expert bears the burden of persuading the trial court that the expert has the necessary qualifications and specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue. A witness may be qualified as an expert by knowledge, skill, experience, training, or education.

An expert may testify in the form of an opinion provided that the underlying facts and data are admitted in evidence, but may not testify regarding another expert's diagnosis. MRE 703; *People v Fackelman*, 489 Mich 515, 534-535; 802 NW2d 552 (2011). Consequently, the proper and limited purpose of a medical report prepared by one doctor, but relied upon by another doctor, is for consideration of the facts and data upon which the testifying expert based his opinion. *Id*. at 535.

Caselaw indicates that failure to properly certify an expert or to obtain expert testimony does not warrant reversal. In *People v Dobek*, 274 Mich App 58, 62; 732 NW2d 546 (2007), the victim alleged that she was molested by the defendant, her stepfather, when she was 12 years old, but the trial did not occur until she was 22 years old. On appeal, the defendant argued that the prosecutor improperly elicited testimony regarding delayed disclosure from a detective, as a lay witness, when expert testimony was required. *Id*. at 76. This Court concluded that even assuming that expert testimony was required, the police detective was qualified to provide an expert opinion on the subject matter in light of his testimony regarding his extensive knowledge, experience, training, and education regarding the sexual abuse of children. *Id*. at 79. The detective delineated the hundreds of investigations he participated in with child victims and the training he received regarding delayed disclosure. *Id*. Thus, through his training, background, and experience in interviewing victims, he became knowledgeable regarding delayed disclosure. *Id*.

## A. HEARSAY CHALLENGES

Respondent contends that certain testimony contained inadmissible hearsay statements. Respondent challenges Dr. Christopher Lee's testimony on the basis that Dr. Lee was not qualified as an expert and improperly relied on the reports of other doctors. Dr. Lee, the orthopedic surgeon who evaluated RJN, testified that RJN's injuries were the result of child abuse. Dr. Lee refreshed his memory during his testimony with the use of *his* three-page report. Dr. Lee did not testify regarding the contents of his report, but instead merely used the report to refresh his memory regarding the location of RJN's fractures. Accordingly, Dr. Lee's testimony did not contain hearsay statements since there was no statement other than the one made by the declarant while testifying at the hearing. See MRE 801(c).

-4-

Furthermore, as noted by the trial court, Dr. Lee's testimony encompassed the information in his medical records. The review of the report allowed Dr. Lee to testify that RJN suffered from several different fractures in various stages of healing. In light of his training and experience, he opined that the fractures were of different ages, ranging from a couple of weeks in age to a couple of months. Dr. Lee noted that he examined his own x-rays to determine the fractures sustained by RJN. Dr. Lee's x-rays did not constitute hearsay because they did not constitute "statements." See MRE 801(c). Dr. Lee also noted that he had treated other children with genetic disorders, but concluded that RJN's injuries were not attributable to a genetic disorder because the child did not have a bone structure that predisposed him to fractures. Dr. Lee also stated that RJN also had a black eye when treated. Although Dr. Lee was shown Exhibits 5 through 7, which were reports of other physicians, the reports were used to refresh Dr. Lee's testimony with regard to the location of RJN's fractures. Like with his own report, Dr. Lee did not testify regarding the contents of the reports in Exhibits 5 through 7. Accordingly, his testimony did not include improper hearsay statements since there were no statements other than those made by the declarant while testifying at the hearing. See *id*.

With regard to medical geneticist Dr. Vinod Misra, respondent contends that Dr. Misra relied on hearsay when he stated that he relied on all of the other information in coming to his opinion that RJN's injuries were caused by abuse and not by a disease. However, Dr. Misra's testimony did not contain hearsay because Dr. Misra merely alluded to the fact that he considered other records in coming to a conclusion on the issue. Like Dr. Lee, Dr. Misra refreshed his memory with the use of his reports, but did not relay the contents of his reports on the record. Accordingly, Dr. Misra's testimony did not contain improper hearsay statements. See MRE 801(c).

Respondent also challenged pediatrician Dr. Anton Osk's testimony as impermissible hearsay. However, Dr. Osk's testimony was not offered for the truth of the matter asserted. Rather, he saw RJN and ODN for a wellness visit and, during the course of the visit, noted that RJN had a lump on his leg. Therefore, he ordered an x-ray to determine the cause of the lump and ensure that a tumor was not present. When he did not receive a response regarding the status of the x-rays from respondent, he called Child Protective Services (CPS). To the extent that his testimony involved conversations with others, the testimony was not offered for its truth, but to explain the course of action he took and why. See MRE 801(c).

Respondent also contends that pediatrician Dr. Marcus DeGraw relied on hearsay evidence because he stated that he reviewed the medical records, impressions and plans, vital signs, laboratory reports, and x-rays before making his final impression of RJN's injuries. He also testified that he spoke with other physicians. However, Dr. DeGraw did not state what the reports said or what the other doctors told him. See MRE 801(c). Dr. DeGraw specifically reported that he learned from respondent and from the record that respondent took RJN for a wellness check and that the pediatrician ordered an x-ray of RJN's thigh during the wellness check. He also explained that the x-ray showed at least two fractures. However, Dr. DeGraw's testimony did not constitute inadmissible hearsay because the statements did not go to the truth of the matter asserted, but instead explained how Dr. DeGraw came to his conclusions regarding the source of RJN's injuries. To the extent that Dr. DeGraw's description of the x-rays as showing fractures went to the truth of the matter asserted, the x-rays did not constitute statements

under MRE 801(c). Accordingly, Dr. DeGraw's testimony did not contain impermissible hearsay statements. See *id*.

Respondent also contended that CPS worker Amy Dumas's testimony incorporated impermissible hearsay because Dumas testified that she relied on RJN's first medical evaluation, an out of court statement instructing respondent to obtain an x-ray, and conversations with hospital staff. Respondent contends that Dumas reviewed several documents and spoke with several people before filing the petition, and admitted that her opinions were based on the documentation. However, Dumas testified that she received a CPS complaint regarding RJN. Because of the complaint, she made contact with respondent. Thus, the receipt of the complaint was not offered for the truth of the matter asserted, but rather, to explain why Dumas made contact with respondent. In addition, Dumas's testimony regarding her discussion with other people and her review of records and documentation did not constitute hearsay since the testimony was not used to prove the truth of the matter asserted, but instead, to explain why Dumas came to the conclusions that she did and why she took the action she took. See MRE 801(c).

With regard to Warren Police Officer Charles Younkin, respondent argues that Officer Younkin's testimony contained impermissible hearsay since he discussed conversations he had with Dr. DeGraw, who reported the injuries he observed on RJN. Officer Younkin also testified regarding conversations he had with other persons not parties to this case. However, the trial court's opinion and order shows that the court only considered Officer Younkin's testimony regarding the statements that respondent made to him, as well as the statements made by O. Neal and O. Neal's relatives regarding the explanations for RJN's injuries. To the extent that Officer Younkin relied on statements made by respondent, the statements were not hearsay. MRE 801(d)(2) (explaining that a party's own statement offered against the party is not hearsay). O. Neal reported that RJN's injuries were likely caused when he fell over in his car seat or by respondent's autistic child, while O. Neal's relatives had no explanation for the injuries. However, it is clear that Officer Younkin's testimony regarding the explanations for RJN's injuries were not admitted for the truth of the matter asserted, but rather, explained why Officer Younkin took the action of reporting the case to the prosecutor. See MRE 801(c).

Respondent further contends that the trial court improperly considered foster-care worker Karlesha Simmons's testimony regarding conversations she had with Reginald Hines (R. Hines), Brenda Harris, and Nicole Hunt, as well as her reliance on an Early On Assessment of BEH and her discussion of BEH with BEH's physician. However, Simmon's testimony with regard to her conversations with R. Hines, Harris, and Hunt involved whether the three were potential relative placements for the children. The testimony did not relate to the statutory grounds for termination. See MCR 3.977. Furthermore, the trial court did not discuss the conversations when discussing Simmons's testimony in it opinion and order on the statutory grounds for termination, and it is therefore clear that the trial court did not consider the testimony when rendering its decision. With regard to the Early On Assessment, Simmons used the assessment to refresh her memory, and she did not discuss the contents of the report. Finally, with regard to her discussion with BEH's primary care physician, Simmons testified that BEH's primary care physician referred BEH for an autism assessment. She did not relate the statements made by BEH's primary care physician. Accordingly, Simmons's testimony did not contain inadmissible hearsay statements. See MRE 801(c). Furthermore, the trial court did not rely on any statements

that BEH's primary care physician made to Simmons in its opinion and order discussing the statutory grounds for termination. For the reasons discussed above, respondent is not entitled to a new trial on the basis of admission of hearsay statements.

## B. REFRESHING RECOLLECTION

Respondent also contends that the trial court improperly permitted petitioner to refresh the recollections of certain witnesses with documents that were not properly authenticated. In order for a witness to refresh his recollection with a writing, there must be a proper foundation. *Genna v Jackson*, 286 Mich App 413, 423; 781 NW2d 124 (2009). "To lay a proper foundation, the proponent must show that (1) the witness's present memory is inadequate, (2) the writing could refresh the witness's present memory, and (3) reference to the writing actually does refresh the witness's present memory." *Id*. The record in this case demonstrates that petitioner laid a proper foundation with regard to each exhibit used to refresh the memory of a witness. However, respondent contends that the materials used to refresh the memories of the witnesses were not properly authenticated. "Where memory or recollection is being refreshed, the material used for that purpose is not substantive evidence. Rather, the material is employed to simply trigger the witnesses' recollection of the events. That recollection is substantive evidence and the material used to refresh is not." *People v Favors*, 121 Mich App 98, 109; 328 NW2d 585 (1982). MRE 901 clarifies that authentication or identification is a condition precedent to *admissibility* of evidence. See MRE 901. Respondent's argument that petitioner was required to authenticate the documents used to refresh the memory of the witnesses is without merit since the exhibits were used to refresh the recollection of the witnesses, and were not admitted as substantive evidence.[3]

## C. EXPERT WITNESSES

Respondent also contends that the court improperly considered the opinions of most of the doctors who testified during the hearing because the doctors did not testify as expert witnesses. Dr. DeGraw testified as an expert witness at the hearing. However, Dr. Lee, Dr. Osk, and Dr. Misra did not testify as expert witnesses at the hearing. Although petitioner did not move to have the doctors testify as experts, the court qualified the doctors as experts in its opinion and order. The court explained that the substance of the doctors' testimony revealed the fact that their testimony constituted expert witness testimony, and the court pointed out that there was no tenable argument that the doctors were not qualified to testify as experts. The court stated that it would consider the testimony of the doctors only to the extent that their opinions were based on admissible evidence.

---

[3] The trial court stated that Exhibits 5 through 7 were not properly admitted, and the court stated that it did not consider Exhibits 8 through 10 as well. The court concluded that Exhibits 4 was admissible because Dr. Lee authenticated his medical records, and the records were admissible under the hearsay exception in MRE 803(6). However, the court also explained that Dr. Lee's testimony covered all of the information in his medical records, and it is therefore unnecessary to determine whether the trial court properly determined that Exhibit 4 was admissible.

While Dr. Osk was not called as an expert witness, it is clear from the record that his role was that of a fact witness. He was called to describe RJN's condition, his need to obtain an x-ray to diagnose the condition, and the failure to obtain respondent's cooperation, resulting in a call to CPS. Accordingly, there was no need to certify him as an expert. Dr. Misra was also not qualified as an expert. However, respondent does not take issue with his training and experience, his qualifications, and his conclusions regarding how to diagnose osteogenesis imperfecta. Dr. Lee did not testify as an expert witness, but he outlined his education and 40 years of training and experience in orthopedic pediatrics during his testimony. Accordingly, we conclude that the trial court did not err in considering the expert opinion testimony of Dr. Misra and Dr. Lee because petitioner laid a proper foundation for each physician's education, professional experience, and expertise.

Regardless, even assuming that the court erred in determining that the doctors were qualified as experts and in considering the testimony of the doctors, the error was harmless because the testimony of Dr. DeGraw, who was qualified as an expert medical doctor with a pediatrics specialty and a focus in child abuse, was sufficient to establish that RJN's injuries were the result of abuse. Dr. DeGraw was qualified as an expert in 400 cases, and he testified as a child abuse expert or a child abuse pediatrician in the majority of the cases. Dr. DeGraw testified that he examined RJN and opined that his injuries were the result of abuse. He conducted a child abuse evaluation of RJN's injuries and found that the number of fractures in various stages of healing coupled with no plausible explanation for the fractures indicated that the fractures were the result of child abuse. There was no objection to Dr. DeGraw's testimony as an expert. The testimony of the other physicians supplemented the testimony of Dr. DeGraw. Therefore, we conclude that even assuming that the court improperly considered the testimony of the other physicians, the testimony of Dr. DeGraw, combined with the admissible testimony of the other witnesses who testified at trial, provided clear and convincing evidence that RJN's injuries were the result of abuse.[4]

## II. STATUTORY GROUNDS

Respondent further argues that the trial court erred in finding by clear and convincing evidence that there were statutory grounds to terminate her parental rights. We disagree.

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "We review for clear error a trial court's finding

---

[4] Respondent also argues that the witnesses improperly referred to the diagnoses of nontestifying physicians, which constituted speculation. However, respondent abandons the argument on appeal by failing to specify which testimony she contends constituted speculation. See *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 626-627; 750 NW2d 228 (2008) (noting that " '[a]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue' ") (citation omitted; alteration in original).

of whether a statutory ground for termination has been proven by clear and convincing evidence." *Id.*. "' A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses.' " *In re Laster*, 303 Mich App 485, 491; 845 NW2d 540 (2013) (citation omitted).

The petition requested termination of respondent's parental rights pursuant to the following provisions of MCL 712A.19b(3):

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.
>
> (k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:
>
> * * *
>
> (*iii*) Battering, torture, or other severe physical abuse.

"[O]nly one statutory ground for termination must be established for each parent[.]" *In re Laster*, 303 Mich App at 495.

Respondent first challenges the trial court's statement in its opinion and order that respondent "has admitted" to the contents of the petition when she pleaded no contest. To the extent that the trial court erred in failing to distinguish between a plea of admission and a no-contest plea, the error was harmless because the trial court detailed at length additional testimony establishing by clear and convincing evidence the allegations in the petition, and we conclude that the remaining facts outlined by the court provided clear and convincing evidence that the grounds in MCL 712A.19b(3)(b)(*i*), (g), (j), and (k)(*iii*) were met.

## A. MCL 712A.19b(3)(b)(*i*) AND (k)(*iii*)

The trial court did not err in concluding that there was clear and convincing evidence that MCL 712A.19b(3)(b)(*i*) and (k)(*iii*) provided statutory grounds for termination. The testimony presented during the hearing established that RJN's injuries were the result of child abuse. Dr. DeGraw testified as an expert in child abuse pediatrics. Dr. DeGraw testified that RJN suffered from multiple fractures at various stages of healing. Dr. DeGraw testified that RJN expressed pain when the area with the leg bump was manipulated, and the bump was readily visible. Additionally, RJN had bruising to his head. Because of the child's age, the injuries could not have been self-inflicted, and the child would have responded to the pain. Dr. DeGraw attempted to obtain a plausible explanation for the injuries and questioned respondent regarding whether the child had been dropped, injured in an accident, or injured by a sibling, but respondent answered negatively to all possibilities. Consequently, the doctor concluded that RJN's fractures were the result of child abuse because they were significant traumatic injuries, their cause was unexplained, the child could not injure himself, he did not receive medical care for the injuries, and the family took several days to complete the x-ray. Dr. DeGraw's conclusion was further supported by the fact that RJN did not suffer any new fractures after the children were removed from respondent's care. Thus, there was evidence establishing that RJN's injuries were the result of child abuse.

Additionally, respondent testified that she was the primary caregiver for the children. She was unemployed and at home with the children the majority of the time, and only occasionally left the children with babysitters. In *In re Ellis*, 294 Mich App 30, 31; 817 NW2d 111 (2011), an infant was taken to the hospital where he was diagnosed with multiple skull fractures and 13 broken bones, including partially healed fractures. The respondents, the infant's parents, had no explanation for the severe injuries, and they admitted that they were the child's only caretakers. *Id*. at 32. The couple did acknowledge that the child was particularly fussy and crying more than usual. *Id*. However, a physician qualified in child abuse was able to explain that the injuries were caused by squeezing the rib cage and forceful shaking. *Id*. There were no accidental, genetic, or childbirth causes to explain the infant's injuries, and therefore, the injuries were caused by physical abuse. *Id*. This Court rejected the contention that termination of parental rights could not occur pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), or (k)(*iii*) because the perpetrator of the abuse was not identified. This Court explained:

> The most significant and interesting argument respondents raise is that it is impossible to determine which of them committed this heinous abuse of the minor child. That would be an extremely relevant, and possibly dispositive, concern in a criminal proceeding against either or both of them, but it is irrelevant in a termination proceeding. When there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care.

> \* \* \*

> Respondents lived together in a small apartment. Both testified that they were the only two individuals who took care of the child. The child suffered

numerous nonaccidental injuries, and the explanations provided were inconsistent with the extent and nature of the child's injuries. The injuries were numerous, highly indicative of child abuse, using a very high force of impact, and inconsistent with any sort of accident. The fact that many of them were in various stages of healing showed that A. Ellis had suffered multiple instances of abuse over a prolonged time. The physician testified that while the child may not have been crying constantly, he would have shown signs of distress at least periodically through lack of appetite, sleeping more, and increased fussiness. Respondents could not offer any plausible alternative explanation for A. Ellis's injuries. We conclude that the trial court properly determined that at least one of them had perpetrated the abuse and at least one of them had failed to prevent it; consequently, it did not matter which did which.

We hold that termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries. The evidence in this case clearly shows that A. Ellis suffered numerous nonaccidental injuries that likely occurred on more than one occasion and that the parents lived together, shared childcare responsibilities, and were the child's sole caregivers. [*Id*. at 33, 35-36.]

Applying this analysis to the present case, there was clear and convincing, legally admissible evidence to support termination of respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*i*) and (k)(*iii*). Respondent and the biological father of the twins were the primary caregivers for the children. Neither provided a plausible and consistent explanation for RJN's injuries. If respondent did not commit the physical abuse that caused RJN's fractures, they were caused by RJN's biological father. However, respondent perpetuated the abuse by seeing signs of it and failing to take RJN to the doctor.

The twins were not taken to the doctor for approximately the first six months of their lives. When advised that an x-ray was necessary to determine the cause of the RJN's leg bump, respondent did not take the child in for the x-ray. Rather, the doctor's office and the doctor himself persistently called respondent to no avail, and CPS had to make an unannounced visit to ensure that the x-ray was taken. The x-rays resulted in the removal of the children from respondent's home because of the discovery of several fractures in various stages of healing. Respondent was advised that an x-ray was necessary to diagnose why RJN was in discomfort. Additionally, RJN's weight was not in the normal percentage ranges for children his age. Thus, even if the leg bump was present at birth, respondent ignored RJN's injury and need for medical care. Accordingly, respondent perpetuated the abuse by failing to obtain treatment for RJN's injuries and allowing additional injury to occur. In addition, the children are reasonably likely to suffer from injury or abuse in the foreseeable future if placed in respondent's home because respondent failed to identify the cause of RJN's injuries or accept responsibility for them. Therefore, MCL 712A.19b(3)(b)(*i*) and (k)(*iii*) were satisfied by clear and convincing, legally admissible evidence.

## B. MCL 712A.19b(3)(g)

We further conclude that there was clear and convincing evidence to support the trial court's decision to terminate respondent's parental rights under MCL 712A.19b(3)(g). Respondent failed to take all of the children to the doctor for regular wellness checks. With regard to BEH, respondent failed to acknowledge that BEH had special needs, and she did not seek services for BEH's special needs while the child was in her care. With regard to RJN, the evidence indicated that when RJN was taken in for a wellness check, RJN had multiple fractures in various stages of healing. He was also malnourished. In addition, respondent was advised of the need to take RJN in for an x-ray, but she failed to do so. When questioned why she did not, she faulted the transportation system. Karen Neiman, respondent's friend, testified that she had provided respondent with rides to take BEH to the doctor, but respondent had not asked her for a ride to the doctor's office recently. Neiman testified that she would have given respondent a ride in order to take the twins to a doctor appointment. Respondent was advised of the need to diagnose the source of RJN's leg bump and that the child was in pain or discomfort because of the bump. Despite this information, she ignored repeated calls from the doctor's office regarding the status of the x-ray. The x-ray was only taken after the doctor involved CPS. Because respondent failed to take any steps to protect RJN from abuse or take measures to eliminate additional abuse, he was not provided with proper care or custody.

The doctrine of anticipatory neglect reasons that " '[h]ow a parent treats one child is certainly probative of how that parent may treat other children.' " *In re LaFrance*, 306 Mich App 713; 858 NW2d 143 (2014) (citations omitted; alteration in original). Thus, respondent's treatment of RJN is indicative of how she may treat her other children in the future. Further, given respondent's unwillingness to follow medical advice and obtain treatment for RJN, combined with her failure to take the children to regular doctor's appointments, there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering the children's young ages. Thus, there was clear and convincing, legally admissible evidence to support this ground for termination.

## C. MCL 712A.19b(3)(j)

There was also clear and convincing evidence supporting the trial court's determination that MCL 712A.19b(3)(j) provided a statutory ground for termination. As discussed above, respondent failed to take the children for regular wellness checks at the doctor's office. Respondent also failed to take RJN for a diagnostic x-ray despite multiple inquiries from the doctor's office and the doctor himself regarding the status of the x-ray. When CPS took measures to ensure that the x-ray occurred, RJN was diagnosed with seven fractures at various stages of healing. As discussed above, respondent did not provide a valid reason for why RJN suffered the factures. There was physician testimony that the fractures were the result of abuse, and the facts of the case indicate that respondent either caused the abuse or failed prevent it.

This demonstrates a reasonable likelihood that RJN, BEH, and ODN would be at risk of harm if returned to respondent's care. Therefore, termination was proper under MCL 712A.19b(3)(j).[5]

## III. BEST INTERESTS

Respondent finally contends that the trial court improperly determined that termination was in the children's best interests. We disagree.

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *Moss*, 301 Mich App at 90. "We review a trial court's decision regarding a child's best interests for clear error." *Laster*, 303 Mich App at 496. We also "review for clear error whether the trial court failed to address a significant difference between each child's best interests." *In re White*, 303 Mich App 701, 716; 846 NW2d 61 (2014).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Factors for the trial court to consider in determining best interests include the " 'the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.' " *White*, 303 Mich App at 713 (citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714. "[T]he trial court 'has a duty to decide the best interests of each child individually.' " *Id*. at 715 (citation omitted).

The trial court did not clearly err in determining that termination of respondent's parental rights was in the children's best interests. As petitioner acknowledges, there was testimony that respondent had a bond with her children. However, the children's bond with respondent is only one factor for the trial court to consider in determining best interests, and the court did not err in determining that other factors significantly outweighed the children's bond with respondent. First, the testimony indicated that the children would not be safe in respondent's care. Respondent was the primary caregiver for the children, and the evidence established that she failed to obtain routine medical care for her children even before the injuries to RJN were discovered. There was testimony that respondent failed to take the children for regular wellness checks. With regard to RJN, although respondent contended that the bump was present on RJN

---

[5] We note that the trial court indicated in its opinion and order that termination was proper under MCL 712A.19b(3)(c)(*i*). We conclude that MCL 712A.19b(3)(c)(*i*) was not a proper ground for termination because termination occurred at the initial dispositional hearing. See MCL 712A.19b(3)(c)(*i*) (contemplating that 182 or more days have elapsed since the issuance of an initial dispositional order). However, the error is harmless because only one ground for termination needs to be established by clear and convincing evidence, and the court properly concluded that the other statutory grounds were established by clear and convincing evidence. See *Laster*, 303 Mich App at 495.

at birth, she failed to take RJN for an x-ray when Dr. Osk ordered it on an expedited basis because of the child's discomfort. Respondent did not find the resources to take her children to the doctor or call an ambulance, contrary to testimony that respondent had the resources to do so. The evidence indicated that either respondent or O. Neal abused RJN, and respondent did nothing to protect the child from further abuse, calling into question the safety of his siblings.

Second, respondent demonstrated an inability to care for all of her children at once. During supervised visits, respondent was unable to address the needs of all three children at once, requiring a worker to intervene to prevent injury when BEH climbed on a table. Since the children's placement in foster care, they were advancing cognitively, improving physically, communicating, and RJN had not suffered any new fractures. Therefore, there was ample evidence to indicate that respondent was not meeting the children's needs and that termination of respondent's parental right would allow them to advance in a safe environment.

Respondent challenges the trial court's decision to consider the best interests of the children collectively, except as otherwise indicated. Although the trial court stated that it was applying the best-interest standard to the children collectively, the court did discuss the children separately to address the different needs and circumstances of BEH and RJN. This Court in *White* clarified that "if the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *White*, 303 Mich App at 715. Respondent does not point out any significant differences between each child's best interests that the trial court failed to consider. The record does not reveal any significant differences between the children that the court did not consider. Accordingly, we conclude that the trial court did not fail to address any significant differences between each child's best interests. See *id*.

Respondent further contends that petitioner failed to consider relative placements for the children. Respondent cites caselaw indicating that the trial court must explicitly consider the children's placement with relatives during the termination hearing. See *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). However, the record reveals that petitioner continuously attempted to locate relative placements for the children, and none of the proposed relative placements were suitable for the children. The relative placement offered by respondent involved respondent's mother, who was on the Department of Health and Human Services Central Registry at the time of the initial placement decision, was living with respondent, and did not have a legal source of income. With regard to R. Hines, the uncle of M. Hines, R. Hines indicated to Simmons that he was not willing to be a foster parent to the children. With regard to Hunt, the sister of M. Hines, the placement applied only to BEH, the child had not had contact with Hunt in years, and there was no indication that Hunt had the ability to care for BEH's special needs. Hunt lived in Virginia, and BEH would have to live in Virginia as well. Simmons explained that it would not be in the best interests of BEH to be placed with Hunt because BEH could not have parenting time visits with respondent or visitations with her siblings. Simmons further explained that BEH would not know who Hunt is. Simmons also testified that she considered Harris, another relative, but Harris was not willing to be a foster-care provider. Therefore, we conclude that petitioner properly considered relative placements, and none of the relatives provided suitable placements for the children. See MCL 722.954a. For these reasons, a preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights was in the children's best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Elizabeth L. Gleicher